UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ARLENE TOPHAM                     CIVIL ACTION NO. 6:17-cv-00693

VERSUS                            JUDGE TRIMBLE

U.S. COMMISSIONER,                MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

### ADMINISTRATIVE  PROCEEDINGS

The original claimant in this proceeding was Ronnie Topham.  Mr. Topham

fully exhausted his administrative remedies before this action was filed in federal

court.  He filed an application for disability insurance benefits ("DIB"), alleging

disability beginning on March 17, 2003.[1]  His application was denied.[2]  He then

requested a hearing, which was held on September 14, 2015 before Administrative

---

[1]        Rec. Doc. 6-1 at 176.

[2]        Rec. Doc. 6-1 at 97.

Law Judge Mary Gattuso.[3]  The ALJ issued a decision on March 24, 2016,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from March 17, 2003 (the alleged disability onset date) through December 31, 2008 (the date on which Mr. Topham was last insured).  On April 12, 2016, Arlene Topham requested that she be substituted as claimant on behalf of her husband due to Mr. Topham's death.[5]  Mrs. Topham then requested review of the adverse decision, but the Appeals Council concluded that there was no basis for review.[6]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). Mrs. Topham then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

Mr. Topham was born on April 5, 1961.[7]  At the time of the alleged onset of disability, he was forty-two years old; at the time of the ALJ's decision, he was just shy of his fifty-fifth birthday.  Mr. Topham dropped out of school in the ninth grade,[8]

---

[3]    The hearing transcript is found at Rec. Doc. 6-1 at 32-74.

[4]    Rec. Doc. 6-1 at 15-25.

[5]    Rec. Doc. 6-1 at 91.

[6]    Rec. Doc. 6-1 at 4.

[7]    Rec. Doc. 6-1 at 176.

[8]    Rec. Doc. 6-1 at 41.

and had relevant work experience as a marine electrician and commercial fisherman.[9] He alleged that he became disabled on March 17, 2003[10] as the result of a work place accident, in which he fell off a ladder while working in the rain and landed on his buttocks, allegedly injuring his spine.[11]  He claimed disability based on lower back injury and failed back syndrome following two lumbar surgeries.[12]

It is undisputed that Mr. Topham underwent back surgery in 2003 and again in 2005, but the treatment notes related to those procedures are not in the record.

On March 2, 2006,[13] Mr. Topham saw Dr. Roger D. Smith, a neurosurgeon at Ochsner Clinic Foundation, in follow up.  Mr. Topham was continuing to complain of pain, had been treated by Dr. Ponder in Houma, Louisiana, in pain management, and was going to be seeing a different pain management doctor in Lafayette, Louisiana.  The treatment note indicates that Mr. Topham had been unable to get back to his previous activity level due to ongoing pain.  Dr. Smith stated "I do not believe that he would be improved with additional spinal surgery, but will need some

---

[9]     Rec. Doc. 6-1 at 42, 67-68, 197.

[10]    Rec. Doc. 6-1 at 176.

[11]    Rec. Doc. 6-1 at 37-38.

[12]    Rec. Doc. 6-1 at 92, 196

[13]    Rec. Doc. 6-1 at 250-251.

continued pain management." He refilled Mr. Topham's prescriptions of Oxycontin, Celebrex, and Soma.

On April 4, 2006, Mr. Topham was seen by Dr. Scott A. Gammel of Louisiana Pain Management in Lafayette, Louisiana. He gave a history in which he described the circumstances of the accident, and stated that he had a lumbar spine operation by Dr. Waguespack in November 2003, which was deemed a failure, then underwent a second operation with a lumbar fusion by Dr. Smith in January 2005. Despite the surgeries, Mr. Topham's symptoms had not improved. Mr. Topham described his pain as located across the lower back and upper buttock with numbness radiating down the back of his left leg. He also had pain in the middle of his back just below and slightly between his shoulder blades. He rated his pain at five to six on a ten-point scale, stated that the worst it gets is ten, and the best it gets is four to five. Mr. Topham told Dr. Gammel that "[a]lmost any physical activity seems to aggravate his symptoms." More particularly, he reported that his pain increased with sitting too long, standing too long, traveling in a car, leaning over, and stooping. He explained that the pain affected his concentration, his ability to sleep, his relationships, and his emotions. He was quite depressed. He had previously undergone physical therapy, and a variety of medications had been used. He felt that there was something unstable in his low back and hips, and he had been informed that there was a question

-4-

about whether one of the pedicle screws implanted during the second surgery was malpositioned.   Examination revealed decreased reflexes and a positive sitting straight leg test on the right as well as lumbar tenderness and tenderness in the mid-thoracic level.  Dr. Gammel's impressions were failed back syndrome with ongoing radicular symptoms as well as a question about the positioning of a pedicle screw and fusion instability.

Dr. Gammel discontinued Oxycontin, started Methadone, and prescribed Lortab for breakthrough pain.  Lyrica was prescribed for neuropathic pain, and Soma was continued.  Dr. Gammel also recommended investigation with regard to whether further surgery would be necessary.

Dr. Gammel obtained x-rays of Mr. Topham's spine on April 13, 2006,[14] which showed stability present in the immobilized segments of the L4 and S1 vertebral bodies, which were traversed by screws and held together with metallic rods posteriorly.

Mr. Topham returned to Dr. Gammel on May 9, 2006.[15]  He reported new, shooting pain into his left buttock that occurred in certain positions.  Although the x-rays did not indicate any instability or a problem with a screw, Mr. Topham continued

---

[14]      Rec. Doc. 6-1 at 362.

[15]      Rec. Doc. 6-1 at 342-345.

to think that there was something mechanically wrong.  He also complained of nausea in the afternoons, not associated with taking his medication.  He stated that he had run out of Lexapro, and his workmen's compensation insurer was refusing to refill it.  Examination showed absent ankle reflexes and a positive sitting straight leg raise test on the right.  Dr. Gammel referred him to Dr. Muldowny for evaluation of his lumbar spine and the hardware placement.  Dr. Gammel prescribed Medrol for acute neuropathic symptoms and restarted the Lexapro.

Mr. Topham returned to Dr. Gammel on September 7, 2006.[16]  He reported that he had seen Dr. Muldowny and that Dr. Muldowny did not think any further surgery was indicated.  He brought in x-rays films, which Dr. Gammel reviewed.  Dr. Gammel stated that "with the exception of one of the screws angling towards the spinal canal, I could not see any serious abnormality. . . nor am I qualified to determine whether there is any specific abnormality of the hardware placement."  Examination again revealed absent ankle reflexes bilaterally and a positive seated straight leg raise test on the right.  Dr. Gammel's impression was "[b]ack pain and lower extremity pain secondary to failed back syndrome."  His plan was to continue the current medications, double the Methadone dose, schedule an epidural steroid

---

[16]     Rec. Doc. 6-1 at 338-341.

injection, and prescribe Clonidine to treat neuropathic symptoms and help with high blood pressure and sleep difficulties.

On September 27, 2006,[17] Dr. Gammel wrote a letter in which he recommended that Mr. Topham be scheduled for a series of epidural steroid injections due to his failed back syndrome. He noted Mr. Topham's persistent lumbar radicular symptoms that lasted despite medical management and conservative care. He stated that "[t]he longer this is allowed to continue to be insufficiently treated then the greater likelihood that his outcome will be poorer and poorer."

Mr. Topham returned to see Dr. Gammel on February 1, 2007.[18] He reported continued pain radiating from his low back down to his buttock and right lower extremity. Dr. Gammel noted that Mr. Topham walked with an antalgic gait, had normal patellar reflexes, positive seated straight leg raise on the right, and diffuse lumbar tenderness. Dr. Gammel's impression was failed back syndrome with lumbar radiculitis. His plan was to refill Mr. Topham's medications and schedule a lumbar epidural steroid injection. A lumbar epidural steroid injection was administered by Dr. Gammel on March 2, 2007.[19]

---

[17]     Rec. Doc. 6-1 at 337.

[18]     Rec. Doc. 6-1 at 334-336.

[19]     Rec. Doc. 6-1 at 331-333.

Mr. Topham returned to see Dr. Gammel on June 19, 2007.[20]  He reported that he was continuing to have pain, which was worse with activity but relatively manageable at rest.  He reported pain in his upper back that comes on suddenly and is sometimes unrelenting despite pain medication.  He described it as sharp, stabbing, and burning when it is severe but is otherwise present as light burning pain.  He stated that this pain had been present since the accident but complained that no one had ever paid attention to it.  Examination revealed decreased reflexes at the right patella and ankle and diffuse tenderness in the lumbar region.  A seated straight leg raise test caused low back pain, greater on the right than the left.  Mr. Topham reported only a short-term response to the epidural steroid therapy.  Dr. Gammel's impressions were (1) failed back syndrome with chronic radicular symptoms and mechanical back pain worsened with activity, and (2) upper back pain in the midline consistent with interspinous/supraspinous ligament sprain, chronic in nature.  Dr. Gammel said: "At this point, I feel I have nothing further to offer him other than continued medical treatment."

Mr. Topham saw Dr. Gammel again on October 8, 2007.[21]  Mr. Topham again reported low back, right buttock, and right lower extremity pain.  He said that he

---

[20]     Rec. Doc. 6-1 at 328-330.

[21]     Rec. Doc. 6-1 at 324-327.

sometimes had a sudden sharp pain radiating down his right leg that caused him to fall.  He also complained of constant burning pain in his upper back.  Mr. Topham was frustrated with his perception that nobody had addressed his upper back pain but Dr. Gammel noted that he had previously diagnosed an interspinous and supraspinous ligament tear and sprain, that thoracic MRI and CT demonstrated normal findings, and that mild degenerative thoracic spine changes had been found.  Examination showed decreased ankle reflexes, a positive seated straight leg raise test on the right, diffuse lumbar tenderness, and localized tenderness over the lower thoracic segment but no edema and no muscle spasms.  Dr. Gammel's impressions were failed back syndrome with chronic lumbar radiculopathy with intermittent exacerbations causing him to fall, and lower thoracic interspinous ligament tear/sprain.  His plan was to add a neuropathic pain medication and a nonsteroidal anti-inflammatory to Mr. Topham's regimen and to refill his other medications.

On January 10, 2008, Mr. Topham again saw Dr. Gammel.[22]  Dr. Gammel noted that Mr. Topham had seen neurologist Dr. Leoni for evaluation and MRIs the previous month.  The MRIs showed some thoracic ligament accentuation consistent with Dr. Gammel's diagnosis of chronic ligament strain causing some dorsal impingement but not causing any cord compromise or stenosis.  The MRIs also

---

[22]     Rec. Doc. 6-1 at 320-323.

showed some early degenerative change at L4-5 but good post-surgical decompression and no signs of recurrent disc herniation. Mr. Topham rated his pain at three to four out of ten and continued to report increased pain with certain types of activity, particularly stair climbing and twisting. Examination showed decreased ankle reflexes, interspinous tenderness in the thoracic area, and diffuse lumbar tenderness. Dr. Gammel's impressions were (1) chronic lumbar nerve root irritation that was accentuated and exacerbated with intermittent sudden symptoms depending on certain positions and activities, and (2) chronic thoracic interspinous ligament and possibly ligamentum flavum sprain. He adjusted Mr. Topham's Lyrica dosage, started him on Naprosyn, discontinued his Lexapro and replaced it with Cymbalta, and continued the other medications. Dr. Gammel also encouraged Mr. Topham to stay awake during the day. Dr. Gammel opined that Mr. Topham was "at maximal medical improvement at this time." He stated that there did not appear to be any invasive treatment that would be helpful. He recommended continued medical management and stated that he would consider lumbar facet injections or possibly transforaminal epidural injections in the future. Additionally, he stated that Mr. Topham might "be a candidate for vocational rehabilitation and some type of reemployment in the future. . . ."

-10-

Mr. Topham returned to Dr. Gammel on April 22, 2008.[23] His patellar reflexes were normal but his ankle reflexes were absent, he had positive seated straight leg raise tests bilaterally, and he was tender over the paraspinous muscles of the entire lumbar spine.  Mr. Topham rated his overall pain at three to four on a ten-point scale.  Dr. Gammel recommended continuation of the current medications and discussed proper exercise.

When Mr. Topham returned to Dr. Gammel on July 23, 2008,[24] he was restless, irritable, paced the room in an antalgic manner, and left the office quite upset.  He reported that he felt like nobody was listening to him and that nobody believed his pain complaints.  He rated his pain at nine out of ten and indicated that his symptoms were getting progressively worse.  He indicated that he felt he was expected to go back to work but he knew that he was incapable of performing any type of employment.  He stated that a small thing like reaching over to pick something up could "knock him down" for two to three days.  He also reported sudden pain that caused him to fall, including a recent event when he fell into the refrigerator and sustained a black eye.  Dr. Gammel's impression was intractable low back pain with an increase in symptoms and very disabling symptoms.  Dr. Gammel stated that "I do

---

[23]     Rec. Doc. 6-1 at 317-319.

[24]     Rec. Doc. 6-1 at 310-314.

not feel that Mr. Topham can be gainfully employed and I also feel that he wants a re-evaluation of his spine and particularly the stability of his spine and placement of his hardware."  He recommended an evaluation with Dr. Williams regarding spinal stabilization and another set of flexion/extension views.    The person who accompanied Mr. Topham to the appointment explained that he had indicated suicidal ideation.  Therefore, Dr. Gammel increased the Cymbalta dosage.  Dr. Gammel stated that he found Mr. Topham to be sincere and "suffering significantly," which warranted further evaluation.

On September 23, 2008, Dr. Najeeb Thomas, a neurologist, initially evaluated Mr. Topham's condition and recommended a myelogram and post-myelogram CT scan.[25]  Dr. Thomas's examination revealed normal motor functioning, normal reflexes in both legs, negative straight leg tests bilaterally, and palpable muscle spasms in his low back.  The myelogram of October 14, 2008 showed postoperative changes at L5-S1 with evidence of anterior interbody fusion and posterior fusion.  It also showed that the right pedicle screw at L5 traverses through the medial cortex of the right pedicle and coming into contact with the right L5 nerve root sleeve where it exits the thecal sac and appearing to compress the right L5 nerve root.[26]

---

[25]       Rec. Doc. 6-1 at 257-258.

[26]       Rec. Doc. 6-1 at 259-260.

Mr. Topham returned to Dr. Thomas on October 23, 2008, complaining of increasing pain that was really bothering him.[27]   Dr. Thomas explained to him the results of the myelogram and post-myelogram CT, which indicated pseudoarthrosis[28] at L5-S1 and the right L5 pedicle screw touching the L5 nerve root on the right side. Dr. Thomas offered a third surgery to remove and replace the hardware with a posterolateral fusion and skeletonizing of the L5 nerve root to make sure that there was no further compression upon it.  Dr. Thomas said:  "Given the fact that he has a breach of the medial wall of the pedicle and he has a pseudoarthrosis, and his pain has gotten worse, he certainly needs to have this revised."

Mr. Topham again saw Dr. Gammel on November 17, 2008.[29]  He complained of low back pain, right buttock pain, and right lower extremity pain.  He described intermittent right buttock numbness with radiation in the right leg down to the foot, particularly after sitting for too long, such as riding in the car to the doctor's visit. He rated his pain at three to four out of ten.  He reported having had a myelogram

---

[27]    Rec. Doc. 6-1 at 256.

[28]    Pseudoarthrosis is a failed union or false joint resulting from a failed spinal fusion. "For fusion surgeries, bone graft is used to achieve fusion and the fusion heals much in the same way a broken bone heals in a cast.  If the bones do not 'weld together' properly, then motion may continue across the area.  For some patients, motion in that area can cause pain similar to that of a broken bone that never heals."  Virginia Spine Institute, htpps://www.spinemd.com/symptoms-conditions/pseudoarthrosis (last visited March 14, 2018).

[29]    Rec. Doc. 6-1 at 307-309.

with Dr. Thomas since his last visit, which showed thecal sac compression from a malplaced or malaligned lumbar fusion screw.  He explained that he had discussed having another surgery but was hesitant to proceed with it.  Examination showed a positive seated straight leg raise test on the right and mild diffuse tenderness to lumbar paraspinous palpation.  Dr. Gammel's impression was known failed back syndrome with recently documented malaligned hardware.  Mr. Topham's medications were continued.

Mr. Topham followed up with Dr. Thomas on January 15, 2009,[30] and they discussed further surgical intervention.  Dr. Thomas explained that a pedicle screw was touching the nerve root at L5 on the right side and that Mr. Topham has pseudoarthrosis and a lot of pain.  He stated that removing the hardware and laying more bone, as well as bolting it down to his ilium would give him a higher chance of fusing.  Dr. Thomas explained that he could not give any guarantees but thought that the sharp, lancinating pain that Mr. Topham was having when he turns or twists would improve with the revision surgery.

---

[30]    Rec. Doc. 6-1 at 255.

Mr. Topham saw Dr. Gammel again on March 17, 2009.[31]  He rated his pain at five to six out of ten and again had a positive sitting straight leg raise test on the right.  Dr. Gammel increased his Clonopine dosage.

Mr. Topham returned to Dr. Thomas on June 2, 2009.[32]  He had been scheduled for surgery but had a tooth abscess that required the surgery to be postponed.  Dr. Thomas opined that, if Mr. Topham decided not to have the proposed surgery, he would be at maximum medical improvement that would require pain management for the rest of his life because the pedicle screw touching the nerve would be very painful.  He further opined that Mr. Topham would be limited to a part-time sedentary job because he has good days and bad days and would not be able to do a lot of walking.  He indicated that Mr. Topham was going to think about whether to proceed with surgery.

On June 4, 2009, Mr. Topham returned to Dr. Gammel[33] and explained that he was undecided about having the proposed surgery, concerned that there is no guarantee it would improve his condition, concerned about the possibility that he might have complications or a worsening of his condition, and concerned about his

---

[31]     Rec. Doc. 6-1 at 304-306.

[32]     Rec. Doc. 6-1 at 254.

[33]     Rec. Doc. 6-1 at 300-303.

-15-

high blood pressure.  Workmen's compensation had stopped paying for his medication and had temporarily stopped his other benefits as well.  His pain continued, his activity level had decreased, and he was described as "distraught."  Dr. Gammel opined that "a fairly large component of his chronic pain. . . is going to be irreversible with surgery."

On July 7, 2009,[34] Dr. Thomas had a rehabilitation conference with Julie Mckeown regarding Mr. Topham.  He reiterated his opinions that, without the proposed surgery, Mr. Topham would be at maximum medical improvement and limited to sedentary part-time work.  He opined that the surgery would likely help his leg pain significantly and could potentially increase his employability.  If Mr. Topham were to have the surgery, he would be at maximum medical improvement one year later.  Dr. Thomas noted that he could certainly understand Mr. Topham's hesitancy to have surgery given the lack of success with the two prior surgeries.

Mr. Topham returned to Dr. Gammel on September 14, 2009.[35]  He continued to report pain worse with moving, having to alter his position to get comfortable, numbness and tingling in his leg in certain positions, and bending in certain positions causing sudden stabbing pain in his back.  His activities were significantly limited.

---

[34]    Rec. Doc. 6-1 at 253.

[35]    Rec. Doc. 6-1 at 296-299.

He rated his pain at seven to eight on a ten-point scale.  Dr. Gammel noted that he and Mr. Topham had a long discussion regarding surgical options.  Physical examination results were the same as before.  Dr. Gammel prescribed a trial Clonidine patch to see if that would help to smooth out his blood pressure and pain relief over time.  Dr. Gammel's impression was failed back syndrome with malpositioned fixation screw.

On October 29, 2009,[36] Dr. Gammel noted that workmen's compensation had denied payment for the recommended Clonidine patches.  Pain at the level of six to seven on a ten-point scale was reported.  A back brace was ordered to help decrease the pain, and the medicine regimen was continued.  Dr. Gammel's noted that Mr. Topham's known severe intractable lumbar radiculopathy was being managed in stable fashion with the current medical management.

Mr. Topham returned to Dr. Gammel on March 25, 2010,[37] reporting that his pain was at the level of nine out of ten.  Dr. Gammel surmised that this was partly due to withdrawal because workmen's compensation had denied payment for Mr. Topham's medications, resulting in his not being able to get them refilled.  Mr. Topham's activity level was noted to be "extremely minimal."  Mr. Topham was a bit irritable and had a tremor in his hand.  His ankle reflexes were absent and his patellar

---

[36]     Rec. Doc. 6-1 at 293-295.

[37]     Rec. Doc. 6-1 at 289-292.

-17-

reflexes on the right were reduced.  The seated straight leg raise test was positive.  He had marked tenderness in the midline in the middle of his lumbar scar.  Dr. Gammel's impression was chronic back pain, status post previous lumbar instrumentation with intractable sharp, stabbing, sudden episodes of pain that significantly limit his function.  A back brace had been tried, but it was unsuccessful because it pressed on the trigger area of Mr. Topham's back.  In addition, Dr. Gammel noted that the workmen's compensation case manager had stopped paying for medications, resulting in Mr. Topham having serious potential withdrawal symptoms.

Mr. Topham saw Dr. Gammel again on June 24, 2010.[38]  His low back pain was radiating not just to his right buttock but also to his left thigh.  He had done better after getting a new case worker and getting his medications restarted.  He rated his pain at four out of ten.  He reported sleep difficulties, minimal activity, sudden sharp radiating symptoms when changing positions, and irritability.  His patellar reflexes were decreased, he had no ankle reflexes, a straight leg test was positive on the right, and Dr. Gammel noted diffuse increased spasm and lumbar paraspinous tenderness bilaterally.  Dr. Gammel added a trial of Xanax, suggested Lyrica, and continued the other medications.

---

[38]    Rec. Doc. 6-1 at 286-288.

-18-

On July 26, 2020, Dr. Gammel filled out a questionnaire for Mr. Topham's workmen's compensation carrier regarding the prescribed medications.[39]

On October 25, 2010, Mr. Topham reported to Dr. Gammel that he was having an increased frequency and severity of shooting, stabbing left groin pain radiating from his back into his left hip, particularly when sitting down. He rated his pain at eight out of ten. Dr. Gammel's impression was L3-4 radiculitis on the left, likely secondary to lumbar spine disease at that level. He recommended obtaining an MRI to rule out any new or acute lumbar spine disease and administered Depo-Medrol and Toradol for acute symptom relief. He continued the current medications.

Mr. Topham followed up with Dr. Thomas on November 11, 2010.[40] He continued to complain of back pain, right leg pain, and pain in his left groin. Dr. Thomas concurred with Dr. Gammel's recommendation of a new MRI and also planned to obtain new x-rays.

On July 18, 2011, Mr. Topham returned to see Dr. Gammel.[41] He complained of ongoing low back pain with intermittent severe stabbing pains both in the right leg and also in the left buttock and left groin area. He had had an MRI since his last visit,

---

[39]   Rec. Doc. 6-1 at 283-284.

[40]   Rec. Doc. 6-1 at 252.

[41]   Rec. Doc. 6-1 at 266-276.

which demonstrated facet arthropathy at multiple levels and foraminal narrowing at L5-S1. He had been told that his spine fusion did not take. Dr. Gammel's assessment was that Mr. Topham had symptoms of an unstable spine. He opined that Mr. Topham was getting intermittent sudden nerve root irritation, depending on his positioning, causing him to have the symptoms he complained of. He further opined that Mr. Topham likely had some underlying degree of chronic nerve irritation from his underlying facet arthropathies at multiple levels. Dr. Gammel recommended that Mr. Topham obtain more surgical opinions, but noted that Mr. Topham was "extremely scared to have repeat surgery." He also recommended maintaining the current medication regimen. That same date, Mr. Topham tested positive for marijuana.[42] A few days later, Dr. Gammel informed Mr. Topham that he would no longer treat him because he had "failed to follow the pain management agreement you signed with us."

On June 11, 2012, Mr. Topham began treating with Dr. John E. Clark for pain management.[43] Dr. Clark noted that, following discharge by Dr. Gammel, Mr. Topham went through significant withdrawal syndrome from Methadone and was currently taking only Lortab for pain, with inadequate pain control. Mr. Topham

---

[42]    Rec. Doc. 6-1 at 270.

[43]    Rec. Doc. 6-1 at 382-385.

rated his pain at eight out of ten and reported that his pain was localized to his lumbar spine radiating down his right leg to the foot in addition to chronic discomfort between his shoulder blades.  He reported that physical therapy in the past had made his pain worse and that epidural steroid injections provided only short tem relief.  Dr. Clark noted that the lumbar myelogram of October 2008 showed the right pedicle screw at L5 contacting the right L5 nerve root.  He also noted that the MRI of January 2011 showed no change in the appearance of the lumbar spine.  Dr. Clark also reviewed a neuropsychologic evaluation by Dr. Kevin Bianchini that indicated Mr. Topham had a pain disorder due to an organic problem with the pedicle screw impinging the right L5 nerve root and superimposed psycho-emotional facts that complicate his pain condition.  Mr. Topham also reported severe sleep disturbance and indicated that he spent most of his time laying in bed because upright activity aggravated his back and right leg pain.  He reported decreased activity since stopping pain medication except for Lortab.  Dr. Clark noted that Mr. Topham rose from a seated position by pushing off with his arms and had an antalgic gait favoring his right leg.  There was marked tenderness in the right T4-T6 paraspinals and rhomboids.  His lumbar scar was tender to touch and there was diffuse tenderness over his muscle attachments to his left and right iliac crest, with the right side more tender than the left.  Mr. Topham stood forward flexed even when standing still, and

-21-

his lumbar range of motion showed forward flexion to forty percent of normal, extension to neutral only, and rotation to the left and right to eighty percent of normal.  Straight leg raises produced pulling pain his low back on the left side at 60 degrees and on the right side at 35 degrees with radicular pain down the right leg.  He also exhibited marked tenderness in the interscapular region on the right side from T4 through T6 spinous processes and thoracic paraspinals.  Mr. Topham had reduced sensation to pinprick and light touch, absent right ankle reflex, and reduced left ankle reflex.  His knee reflexes were normal.  X-rays of the lumbar spine showed posterior fusion hardware at L5-S1with medial track of right L5 pedicle screw.  X-rays of the thoracic spine showed no compression fractures or thoracic spine abnormalities except for mild degenerative changes.  Dr. Clark's impressions were failed back syndrome with right L5/S1 radicular pain due to pedicle screw impingement on the L5 nerve root, upper thoracic myofascial pain, chronic pain, and a family and personal history of addictive behaviors.  He prescribed Methadone, Norco, Zofran (for nausea), an electro stimulation trial for axial pain, and provided information regarding a dorsal column stimulator.

Mr. Topham followed up with Dr. Clark's office on July 9, 2012.[44]  After discussion with Dr. Clark, it was decided that a repeat thoracic MRI would be

---

[44]        Rec. Doc. 6-1 at 380-381.

conducted to investigate any new pathology. His pain was averaging six to seven on a ten-point scale. Naprosyn, an anti-inflammatory, was added to his medicine regimen, which also included Methadone, Zanaflex, Norco, Zofran, and Cymbalta. A muscle stimulator trial had improved his thoracic pain for a short period of time, and he was given information on the spinal cord stimulator.

Mr. Topham saw Dr. Jeremy A. Comeaux in Dr. Clark's office on August 3, 2012.[45] His workmen's compensation insurer had refused the request for another MRI. A muscle stimulator was improving his muscle spasms, but workmen's comp no longer approved those treatments. His medications were renewed.

When Mr. Topham saw Dr. Clark again on September 7, 2012,[46] Dr. Clark noted that palliative treatment was being provided. He also noted that Mr. Topham had excellent myofascial release, a markedly increased range of motion, and reduced posterior trunk pain following a "myofascial E stim release program." Dr. Clark also noted that Mr. Topham did not want to pursue further surgery because he had already had two surgeries with poor outcomes. Dr. Clark stated that use of a dorsal column stimulator was a final option for Mr. Topham to control his back and right leg pain, and Mr. Topham wished to proceed with a trial. It was noted that the medication

---

[45]    Rec. Doc. 6-1 at 379.

[46]    Rec. Doc. 6-1 at 378.

regimen caused some constipation, nausea, and dizziness.  The medications were renewed, and approval for the dorsal column stimulator would be sought.

Mr. Topham again followed up with Dr. Clark on October 9, 2012.[47]  The spinal cord stimulator was not approved by workmen's comp, so he was receiving palliative care.

Mr. Topham again followed up with Dr. Clark on December 6, 2012.[48]  A psychological evaluation was pending for approval to proceed with the dorsal column stimulator trial.  In the meantime, his medications were continued.  Dr. Clark noted that Mr. Topham's pain was reasonably well controlled with medications, his pain level was averaging four to six out of ten, and his reported side effects were sweating and occasional dizziness.

When Mr. Topham returned to Dr. Clark on February 6, 2013, his complaints and his medications remained the same.[49]

On March 5, 2013, Dr. Clark performed a procedure implanting a spinal cord stimulator.[50]  On March 8, 2013, the spinal cord stimulator was removed because Mr.

---

[47]     Rec. Doc. 6-1 at 377.

[48]     Rec. Doc. 6-1 at 376.

[49]     Rec. Doc. 6-1 at 375.

[50]     Rec. Doc. 6-1 at 374.

Topham had no significant pain relief.[51]  Mr. Topham returned to see Dr. Clark on April 8, 2013.[52]  Examination showed that his motor strength was 5 by 5 bilaterally, his deep tendon reflexes were 2+ bilaterally, he was neurologically intact, and he had a full range of motion in all extremities.  Dr. Clark noted that he would be maintained on his current treatment plan.

Mr. Topham returned to Dr. Clark on May 6, 2013.[53]  His status and medication regimen remained the same.  On June 4, 2013, he was seen by Dr. Walter W. Ellis in Dr. Clark's group, and his status and medications were again the same.[54]  Mr. Topham saw Dr. Ellis again on July 3, 2013, and his status and medication were unchanged.[55]  When Mr. Topham returned to see Dr. Clark on August 2, 2013, Dr. Clark noted that multiple intervention procedures for Mr. Topham's failed back syndrome had been unsuccessful, and he renewed Mr. Topham's medications.[56]  Dr. Clark's notes from Mr. Topham's appointment on September 27, 2013 are virtually identical.[57]

---

[51]    Rec. Doc. 6-1 at 373.

[52]    Rec. Doc. 6-1 at 372.

[53]    Rec. Doc. 6-1 at 371.

[54]    Rec. Doc. 6-1 at 370.

[55]    Rec. Doc. 6-1 at 369.

[56]    Rec. Doc. 6-1 at 368.

[57]    Rec. Doc. 6-1 at 367.

On November 25, 2013,[58] Dr. Clark repeated x-rays of Mr. Topham's lumbar spine, documenting a solid lumbar fusion at L5-S1.  He noted that Mr. Topham did have facet arthropathy above the fusion site with mild segmental motion abnormalities above the fusion, and he suspected facet mediated pain above the fusion site at L3-4 and L4-5.  He recommended a trial of lumbar medial branch blocks at the two facet joints above the fusion site on either side to see if this would give Mr. Topham some relief.  If so, Dr. Clark would recommend proceeding with lumbar facet rhizotomy.  In the meantime, he prescribed Methadone for pain, Lactulose for constipation, Ibuprofen as an anti-inflammatory, Zanaflex as a muscle relaxant, Norco for breakthrough pain, and Zofran for nausea.

On December 17, 2013,[59] Dr. Clark noted that Mr. Topham had been approved for facet injections, which were scheduled for the near future.  His medications were continued.  On January 23, 2014,[60] Mr. Topham saw Dr. Gray Barrow in Dr. Clark's practice, who noted that Mr. Topham underwent facet injections above his fusion site at L3-4 and L4-5, which did not provide him any relief.  Therefore, he was not a candidate for lumbar rhizotomy.  Mr. Topham's pain averaged six out of ten, and he

---

[58]    Rec. Doc. 6-1 at 366.

[59]    Rec. Doc. 6-1 at 364.

[60]    Rec. Doc. 6-1 at 422.

denied any side effects.  Dr. Barrow's assessment was lumbrosacral pain, lumbar degenerative disc disease and facet arthropathy, as well as status post lumbar fusion at L5-S with failed back syndrome.

Mr. Topham next saw Dr. Clark on February 20, 2014[61] and March 20, 2014.[62] His condition and his treatment remained unchanged.

On April 17, 2014, Mr. Topham reported to Dr. Barrow that he was experiencing increased pain in his low back and right leg as well as increased muscle spasms in his lumbrosacral region, right hip, and right leg.  His pain averaged six out of ten.  Dr. Barrow recommended neuromuscle stimulation to alleviate muscle spasms and reduce inflammation.

Mr. Topham again saw Dr. Clark on May 19, 2014.[63]  He reported that his pain increases with activity and averages three to five on a ten point scale.  Dr. Clark added a trial of Lyrica and opined that Mr. Topham was clinically stable.  When Mr. Topham returned to see Dr. Clark on June 16, 2014,[64] he reported that he did not try

---

[61]    Rec. Doc. 6-1 at 420.

[62]    Rec. Doc. 6-1 at 418.

[63]    Rec. Doc. 6-1 at 414.

[64]    Rec. Doc. 6-1 at 412.

the Lyrica due to a bad reaction with it in the past. He again reported that his pain increased with activity but Dr. Clark noted that "[h]e is functionally independent."

On August 11, 2014, Mr. Topham was seen by Dr. Barrow,[65] and his medications were renewed. On September 22, 2014, Dr. Barrow noted that he planned to wean Mr. Topham off his Methadone dosage over several months. On October 21, 2014, Dr. Clark decreased Mr. Topham's Methadone dosage.[66] Dr. Barrow met with Mr. Topham on November 21, 2014, and there were no changes to his symptoms or the treatment.[67]

When Mr. Topham returned to see Dr. Clark on December 22, 2014,[68] his medications were again renewed, and Dr. Clark said that Mr. Topham "is clinically stable and he is fully functional with no mobility issues." Dr. Clark reevaluated Mr. Topham's condition on January 21, 2015 and noted that no new problems were reported.[69] On February 19, 2015,[70] Dr. Clark noted that Mr. Topham remained functionally independent and was "doing quite well." His medications were renewed.

---

[65]    Rec. Doc. 6-1 at 410.

[66]    Rec. Doc. 6-1 at 406.

[67]    Rec. Doc. 6-1 at 403.

[68]    Rec. Doc. 6-1 at 401.

[69]    Rec. Doc. 6-1 at 399.

[70]    Rec. Doc. 6-1 at 397.

Mr. Topham again saw Dr. Clark on March 19, 2015, and his symptoms and medications remained unchanged.[71]  On April 16, 2015,[72] Dr. Clark noted that Mr. Topham's medications were "working well to control his pain," that he "is able to lead a normal lifestyle with his medication regimen," that he had no new problems, and that he was clinically stable.  He renewed his medications.

On September 7, 2015, Dr. Clark wrote a letter in which he explained that he had been treating Mr. Topham since June 2012 for chronic residual lumbar and right leg pain following two back surgeries.  He also explained that imaging revealed a pedicle screw at the L5 level impinging on the right L5 nerve root, producing intractable right leg discomfort.  He noted that the screw was not removed or revised because there is no guarantee that this would clear the right leg pain since, in his opinion, there was chronic damage to the right L5 nerve root producing chronic radicular pain into the right leg.   Treatment included activity restriction and medications.  Current medications were Norco, Methadone, Zanaflex at bedtime for sleep, Zofran as needed for nausea, Ibuprofen as an anti-inflammatory, and Lactulose for constipation.  He stated that Mr. Topham had been compliant with his medication regimen since starting treatment with Dr. Clark.  He explained that the treatment

---

[71]       Rec. Doc. 6-1 at 395.

[72]       Rec. Doc. 6-1 at 393.

being provided was basically palliative and that Mr. Topham's symptoms preclude him from working in a competitive job market.

On September 14, 2015, Mr. Topham testified at a hearing regarding his symptoms, his medical treatment, and his functional impairments. He confirmed that his back was injured in an industrial accident in 2003 and that he received state workmen's compensation benefits until settlement of his claim in June 2014. Following the accident, he underwent unsuccessful surgery by a Dr. Waguespack, followed by a second unsuccessful surgery by Dr. Roger Smith in 2005. Thereafter, Mr. Topham treated with pain management doctors. At some point, Mr. Topham was told that a pedicle screw implanted during the second surgery was touching a nerve root, resulting in continued pain, and he was also told that the fusion was unstable. At the time of the hearing, he was taking Methadone, Norco, an anti-inflammatory medication, Zofran, and a laxative. He explained that his pain medications cause nausea and constipation and also interfere with his ability to think clearly. Mr. Topham explained that he tried smoking marijuana in an effort to control the nausea, which resulted in his pain management physician discontinuing treatment. Mr. Topham stated that he no longer drove because he was easily distracted. He stated that his ability to sit for long periods of time is impaired as well as his ability to stand or walk. He described his pain as covering his lower buttocks and leg all the way

down to his heel. He stated that he is at his best when he wakes up in the morning, and the pain worsens as the day goes on.

Following the hearing, Mr. Topham was evaluated by Dr. Andriette Fitch on December 4, 2015.[73] Mr. Topham told Dr. Fitch that he can walk very short distances on level ground, has difficulty standing for five to fifteen minutes, has difficulty lifting more than five to ten pounds with either arm, is not able to drive, sweep, mop, vacuum, or shop for groceries. He said that he can climb no more than two or three steps, cannot care for the yard, and cannot mow the grass.

Dr. Fitch observed that Mr. Topham could get up and out of a chair and on and off the examination table without difficulty. She observed that his gait was normal. Sitting straight leg raise tests on both legs were positive. Because Mr. Topham stated that he could not be placed in a supine position, Dr. Fitch was unable to assess his straight leg raises in the supine position. She stated that he was able to walk on his toes and heels and could squat but he had difficulty bending over and touching his toes due to pain. She determined that he had normal grip strength in both hands, and normal fine and gross manipulative skills in both hands. His motor strength was 5/5 in all extremities. His reflexes were 2+ on both biceps and 2+ on both patellas. The range of motion in his cervical spine, shoulders, elbows, wrists, hands, knees, hips,

---

[73]     Rec. Doc. 6-1 at 439-452.

and ankles was within normal limits. The range of motion in his lumbar spine was limited to 70 degrees forward flexion, 20 degrees extension, 20 degrees lateral flexion on the right and left, 25 degrees rotation right and left, but no joint deformity was noted. She opined that Mr. Topham has limitations in standing and walking but is able to stand and walk frequently or for 1/3 to 2/3 of an eight-hour work day. She also opined that he has a limited ability to bend or stoop. She stated that he walks without difficulty and without an assistive device. She opined that Mr. Topham could sit for two hours at a time, stand for one hour at a time, and walk for two hours at a time without interruption. She also opined that he could sit for four hours, stand for two hours, and walk for two hours out of an eight hour work day. She noted no difficulties in using his hands, and she opined that he could use his right foot occasionally (up to 1/3 of the day) and his left foot frequently (1/3 to 2/3 of the day). She opined that he could never climb stairs, ramps, ladders, or scaffolds but could balance frequently (1/3 to 2/3 of the day), and stoop, kneel, crouch, and crawl occasionally (up to 1/3 of the day).

Mr. Topham passed away on February 15, 2016,[74] but no cause of death was found in the record.

---

[74]     https://www.dignitymemorial.com/obituaries/morgan-city-la/ronnie-topham-6804880, last visited March 13, 2018.

Mrs. Topham now requests reversal of the Commissioner's decision.

### ANALYSIS

**A.    STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[75] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[76] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[77]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[78] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence

---

[75]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[76]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[77]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[78]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

or substituting its judgment for that of the Commissioner.[79]  Conflicts in the evidence[80] and credibility assessments[81] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[82]

## B.  ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[83]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

---

[79]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[80]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[81]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[82]     *Wren v. Sullivan*, 925 F.2d at 126.

[83]     See 42 U.S.C. § 423(a).

twelve months."[84]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[85]

## C.  **EVALUATION PROCESS AND BURDEN OF PROOF**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[86] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[87]

---

[84]    42 U.S.C. § 1382c(a)(3)(A).

[85]    42 U.S.C. § 1382c(a)(3)(B).

[86]    20 C.F.R. § 404.1520.

[87]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[88] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[89]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[90]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[91]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[92]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[93]

---

[88]    20 C.F.R. § 404.1520(a)(4).

[89]    20 C.F.R. § 404.1545(a)(1).

[90]    20 C.F.R. § 404.1520(e).

[91]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[92]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[93]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

### D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant did not engaged in substantial gainful activity after March 17, 2003.[94]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant had the following severe impairments:  status post lumbar discectomy and fusion, pseudoarthrosis, and possible lumbar screw misalignment.[95]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[96]  Mrs. Topham did not challenge this finding.

The ALJ found that the claimant had the residual functional capacity to perform sedentary work within the following parameters:  no climbing ladders, rope or scaffolds; no more than occasional balancing, stooping, kneeling, crouching,

---

[94]    Rec. Doc. 6-1 at 17.

[95]    Rec. Doc. 6-1 at 17.

[96]    Rec. Doc. 6-1 at 17.

crawling, or climbing ramps or stairs; no work with dangerous or moving machinery; and no work at dangerous heights.[97]  Mrs. Topham challenges this finding.

At step four, the ALJ found that the claimant was not capable of performing his past relevant work.[98]  Mrs. Topham does not challenge this finding.

At step five, the ALJ found that Mr. Topham was not disabled from the alleged disability onset date of March 17, 2003 through December 31, 2008, the date on which Mr. Topham was last insured, because there were jobs in the national economy that he could perform.[99]  Mrs. Topham challenges this finding.

## E.    THE ALLEGATIONS OF ERROR

Mrs. Topham claims that the ALJ erred (1) by failing to base her decision on the entirety of the evidence in the record; (2) by failing to reach a decision that was supported by substantial evidence; and (3) by failing to address the "Proffer Comments" submitted on behalf of Mr. Topham.  This Court finds that all three of these allegations of error actually raise the same issue, i.e, whether the ALJ properly evaluated the evidence in the record and reached a decision that is supported by substantial evidence with regard to Mr. Topham's residual functional capacity.

---

[97]    Rec. Doc. 6-1 at 21.

[98]    Rec. Doc. 6-1 at 24.

[99]    Rec. Doc. 6-1 at 24-25.

## F.  DID THE ALJ PROPERLY EVALUATE MR. TOPHAM'S RESIDUAL FUNCTIONAL CAPACITY?

Mr. Topham was last insured for Social Security Disability benefits on December 31, 2008.  Therefore, in order for Mrs. Topham to obtain benefits, Mr. Topham must be found to have been disabled prior to the end of 2008.

An adverse decision by the ALJ is entitled to deference when proper legal standards were applied in reaching the decision, and when the decision is supported by substantial evidence in the record.  Mr. Topham's primary complaint was pain – pain between his shoulders and pain in his low back radiating down into his right leg, which began with an accident in 2003 and persisted after two failed lumbar surgeries in 2003 and 2005.  Pain can be a disabling impairment.[100]  Pain constitutes a disabling condition when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[101]  To determine whether pain is disabling, Social Security Ruling 96-7p and the Fifth Circuit[102] require that the ALJ first analyze whether there is an objective basis for a claimant's pain and then, if there is a pain-causing impairment, analyze the extent to which the pain affects the claimant's ability to perform basic work activities.

---

[100]    *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

[101]    *Falco v. Shalala*, 27 F.3d at 163.

[102]    See *Salgado v. Astrue*, 271 Fed. App'x 456, 458-59 (5th Cir. 2008).

The second step requires the ALJ to evaluate the credibility of the claimant's statements regarding his symptoms and their functional effects.

In this case, there is an objective basis for Mr. Topham's pain complaints. He was injured in an industrial accident in 2003 when he fell from a ladder and landed in a seated position. He underwent lumbar surgery soon thereafter, which did little to alleviate his symptoms. In 2005, he underwent a more extensive procedure involving spinal fusion with the implantation of hardware. Again, he noted little improvement following that procedure. He continued to experience pain with activity and he had a sense that his spine was unstable. In 2008, a myelogram and a CT scan performed following the myelogram revealed that a pedicle screw implanted during the second surgery was compressing the nerve root at L5 and also revealed that the fusion was incomplete or unstable. Mr. Topham was offered a third surgical procedure to remove the hardware, including the malpositioned screw, and reinstall new hardware in an effort to relieve the compression at L5 and otherwise help to achieve a stable fusion.

The ALJ's decision that Mr. Topham had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment is based in large part on Mr. Topham's decision not to undergo a third surgical procedure. The ALJ said: "The totality of the evidence supports a finding that medical

improvement was achieved prior to the date last insured, as the claimant elected not to undergo further surgical intervention."[103]  The ALJ also found that Mr. Topham's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible.

After having had two failed operations, Mr. Topham was reluctant to undergo another surgical procedure.  He told Dr. Gammel that he was concerned because there was no guarantee that further surgery would improve his condition, concerned that the proposed surgery might result in complications or a worsening of his condition, and concerned about how his high blood pressure might impact another surgical procedure.  In fact, he told Dr. Gammel that he was "extremely scared to have repeat surgery."  Mr. Topham's fears were likely well-founded since Dr. Gammel opined that  "a fairly large component of his chronic  pain. . . is going to be irreversible with surgery."  The ALJ did not mention Dr. Gammel's opinion in this regard but quoted Dr. Thomas's opinion that the proposed surgery likely "would help his leg pain significantly."  Similarly, the ALJ did not mention Dr. Thomas's opinion that Mr. Topham's fears were understandable under the circumstances.

Failure to have surgery in such a situation is not an indication that Mr. Topham's pain did not limit his functionality nor is it an indication that Mr. Topham's

---

[103]     Rec. Doc. 6-1 at 20.

pain was not as severe as he claimed it to be. This is particularly true since various other methods of treating his pain failed. Mr. Topham took Methadone for years, but still needed Norco for breakthrough pain, and when his workmen's compensation insurer stopped approving this medication, he went through withdrawal from those strong opioid medications. Furthermore, despite taking those strong painkillers, he still consistently reported to his physicians that his pain never fully went away. Physical therapy did not alleviate his lumbar pain. Lumbar epidural steroid injections provided only short-term relief. A back brace made his pain worse. A spinal cord stimulator provided little relief. The fact that Mr. Topham was willing to try these various alternatives to surgery in an effort to get some relief from his pain – and the fact that each of them failed – evidenced the level of pain that he was enduring. Additionally, there were indications that Mr. Topham was depressed and sometimes even suicidal.

Mr. Topham consistently complained to his physicians that activity caused his pain to increase. While it is true that Dr. Gammel encouraged Mr. Topham to try to stay awake during the day and counseled him with regard to appropriate exercise, Mr. Topham consistently related an increase in his pain level to an increase in activity, particularly walking long distances, riding in the car for long distances, climbing stairs, and twisting his body. The ALJ cited Dr. Clark's December 2014 statement

that Mr. Topham was clinically stable and fully functional with no mobility issues, in support of her conclusion that Mr. Topham was not disabled in 2014 and therefore could not have been disabled in 2008.  But that one comment from Dr. Clark is glaring because it is inconsistent with the many treatment notes throughout the record in which pain complaints and functional limitations were noted.  An "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."[104]  Placing emphasis on that anomalous comment is an example of prohibited "picking and choosing."

In June 2009, Dr. Thomas opined that Mr. Topham "would be limited to a part time sedentary job, as he has good days and bad days, certainly he would not be able to get up and ambulate a lot."  This opinion has little value because it was not expressly supported by objective findings or estimates of the amount of time Mr. Topham could likely spend in various functional activities.  Six years later, and well after Mr. Topham's date last insured, Dr. Gammel opined that "[s]ymptoms preclude him working in a competitive job market."  Again, this opinion has little value because it was not tied to particular functional abilities in addition to references to the pain that Mr. Topham described.

---

[104]     *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

At the hearing,[105] Mr. Topham testified that he was unable to sit for a period of two hours, and the ALJ noted for the record that Mr. Topham stood up during the hearing. Mr. Topham stated that the pain requires him to change positions frequently, typically going from being about three-quarters of the way back in a recliner on one side, to lying down on the couch. He testified that his activity level never returned to what it was before the accident. He estimated that his pain is at a level of three to four on a ten-point scale when he wakes up and reaches seven on an average day. He testified that even when he does nothing, he still has pain but the pain is worse when he does more. There is no evidence in the record to dispute Mr. Topham's testimony or his doctors' treatment notes, which also link the level of Mr. Topham's pain with his activity level.

In summary, this Court finds that the ALJ's conclusion that Mr. Topham's pain was not disabling is not supported by substantial evidence in the record. Consequently, this Court will recommend that this matter be remanded to the Commissioner for another evaluation of Mr. Topham's residual functional capacity.

---

[105]     Rec. Doc. 6-1 at 44-47, 60-61, 66.

## G.  DID THE ALJ PROPERLY CONSIDER THE EFFECTS OF MR. TOPHAM'S MEDICATIONS?

Although Mrs. Topham did not allege that the ALJ erred in failing to sustain her burden at Step 5 of the evaluative process, this Court is compelled to raise this issue on its own.[106]  At Step 5 of the sequential process for determining whether a claimant is disabled, the Commissioner bears the burden of proof.  In this case, the Commissioner found that there are jobs in the economy that Mr. Topham could have performed.  That conclusion was based on information provided by a vocational expert at the hearing in response to a series of hypothetical questions.  But none of the hypotheticals pertained to a person who would have to take Methadone, Lortab, Norco, or other opioid medications during the workday in order to control his pain.  The vocational expert testified that most employers drug test,[107] and she was asked

---

[106]    Although no direct Fifth Circuit authority for this principle was located, courts in other circuits have addressed this issue.  The Eighth Circuit has held that a court reviewing a Social Security disability ruling is empowered to raise issues on its own. *Battles v. Shalala*, 36 F.3d 43, 45. n. 2 (8th Cir. 1994). In *Womack v. Astrue*, No. CIV-01-167-W, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008), a district court in Oklahoma raised issues *sua sponte*, relying upon a Fifth Circuit ruling holding that a "reviewing court may not. . . abdicate its traditional judicial function, nor escape its duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable, and whether the hearing examiner applied correct legal standards to the evidence," quoting *Bridges v. Gardner*, 368 F.2d 86, 90 (5th Cir. 1996).  Furthermore, the United States Supreme Court has held that a claimant need not exhaust issues in order to preserve his right to judicial review of those issues. *Sims v. Apfel*, 530 U.S. 103, 112 (2000).  Therefore, this Court finds that it "cannot . . . ignore obvious and prejudicial errors, even if the litigants did not identify and debate them." *Womack v. Astrue*, 2008 WL 2486524, at *5.

[107]    Rec. Doc. 6-1 at 72.

-45-

whether taking such medications would preclude a person from being hired or whether taking such medications would prevent a person from sustaining employment after being hired.  But she did not directly answer that question.  Instead, she merely stated that, if such a person were hired, the medication would be disclosed, and the employer would know that a positive drug screen was going to occur.  The vocational expert's testimony did not state that a person taking the medications that Mr. Topham took would be able to get a job or to maintain a job.  Accordingly, this Court finds that the Commissioner did not satisfy her burden of proof at this step of the analysis, mandating remand.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) evaluate Mr. Topham's residual functional capacity as of December 31, 2008, and (2) determine whether there were jobs that existed in significant numbers in the national economy that Mr. Topham could have performed while taking the medications that he was taking during the time period between March 17, 2003 and December 31, 2008.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g),

any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[108]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[109]

---

[108]     See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

[109]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 16th day of March 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE